**RECORD NO. 12-4184**

*In The*

# United States Court of Appeals

### *For The Fourth Circuit*

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

## v.

## BARRY ADKINS,

*Defendant – Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON**

––––––––––––––

### BRIEF OF APPELLANT

––––––––––––––

Terry N. Grimes
GRIMES & WILLIAMS, P.C.
320 Elm Avenue, SW
Roanoke, Virginia 24016
(540) 982-3711

*Counsel for Appellant*

**THE LEX GROUP** ♦ 1108 East Main Street ♦ Suite 1400 ♦ Richmond, VA 23219
(804) 644-4419 ♦ (800) 856-4419 ♦ Fax: (804) 644-3660 ♦ www.thelexgroup.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................... iii

JURISDICTIONAL STATEMENT ............................................................. 1

STATEMENT OF THE ISSUES ................................................................. 1

STATEMENT OF THE CASE .................................................................... 2

STATEMENT OF FACTS ........................................................................... 4

SUMMARY OF ARGUMENT .................................................................... 9

ARGUMENT AND AUTHORITIES........................................................... 10

    I.    THE DISTRICT COURT ERRED BY DENYING
        DEFENDANT'S MOTION IN LIMINE CONCERNING
        THE BANK TELLER AND ADMITTING THE
        TESTIMONY OF THE BANK TELLER
        CONCERNING THE SMELL OF MARIJUANA ................. 10

    II.   THE DISTRICT COURT ERRED BY FAILING TO
        ORDER THE UNITED STATES TO PRODUCE THE
        SUSPICIOUS ACTIVITY REPORT...................................... 16

    III.  THE DISTRICT COURT ERRED BY ADMITTING
        HEARSAY TESTIMONY FROM CASE AGENT
        BEVINS ................................................................................. 23

    IV.  THE DISTRICT COURT ERRED BY ADMITTING
        BEVINS' OPINION TESTIMONY CONCERNING
        THE CREDIBILITY OF THE GOVERNMENT
        INFORMANTS ...................................................................... 26

    V.   THE DISTRICT COURT ERRED BY ADMITTING
        EVIDENCE THAT ADKINS RESIDED ON KINGPIN
        LANE .................................................................................... 27

VI. THE DISTRICT COURT ERRED BY FINDING THAT THE EVIDENCE WAS SUFFICIENT TO SUPPORT A FINDING THAT ADKINS WAS GUILTY OF CONSPIRACY TO DISTRIBUTE AND DISTRIBUTION OF MORE THAN 1000 KILOGRAMS OF MARIJUANA........................................... 29

VII. THE DISTRICT COURT ERRED BY DENYING ADKINS' MOTIONS FOR A NEW TRIAL .......................... 33

VIII. THE DISTRICT COURT MADE CERTAIN ERRORS AT SENTENCING, INCLUDING ATTRIBUTING TO ADKINS MORE THAN 1000 KILOGRAMS OF MARIJUANA; IMPOSING AN ENHANCEMENT FOR OBSTRUCTION OF JUSTICE; AND DENYING THE SAFETY VALVE TO ADKINS ............................................ 37

CONCLUSION ........................................................... 43

REQUEST FOR ORAL ARGUMENT ....................................... 43

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

## <u>TABLE OF AUTHORITIES</u>

<u>**Page(s)**</u>

### <u>CASES</u>

*Barr v. Dolphin Holding Corp.*,
    141 N.Y.S.2d 906 (1955) ............................................................ 22-23

*Berger v. United States*,
    295 U.S. 78, 55 S. Ct. 629, 79 L. Ed. 1314 (1935) ............................. 27

*Brady v. Maryland*,
    373 U.S. 83, 83 S. Ct. 1194; 10 L. Ed. 2d 215 (1963) ............... *passim*

*First Options of Chi., Inc v. Kaplan*,
    514 U.S. 938, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995) ................. 16

*Gall v. United States*,
    552 U.S. 38, 128 S. Ct. 586, 169 L. Ed. 2d 445 (2007) ..................... 37

*Giglio v. United States*,
    405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972) ..... 16, 18, 19, 22

*Glasser v. United States*,
    315 U.S. 60, 62 S. Ct. 457, 86 L. Ed. 680 (1942) .............................. 30

*Hall v. United States*,
    419 F.2d 582 (5th Cir. 1977) ............................................................ 27

*Houston v. Estelle*,
    569 F.2d 372 (5th Cir. 1978) ............................................................ 27

*Johnson v. United States*,
    520 U.S. 461, 117 S. Ct. 1544, 137 L. Ed. 2d 718 (1997) ..... 24, 28, 30

*King v. Rumsfeld*,
    328 F.3d 145 (4th Cir. 2003) ............................................................ 13

*Kyles v. Whitley*,
   514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) ................ 19

*Strickler v. Greene*,
   527 U.S. 263, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999) ................ 19

*United States v. Akinadewo*,
   (Criminal No. 11-150) (D.C. June 1, 2011) ...................................... 21

*United States v. Carter*,
   564 F.3d 325 (4th Cir. 2009) .............................................................. 37

*United States v. Chavis*,
   880 F.2d 788 (4th Cir. 1989) .............................................................. 34

*United States v. Corona*,
   551 F.2d 1386 (5th Cir. 1977) ............................................................ 27

*United States v. Dunnigan*,
   507 U.S. 87, 113 S. Ct. 1111, 122 L. Ed. 2d 445 (1993) ............ 40, 41

*United States v. Edwards*,
   945 F.2d 1387 (7th Cir. 1991) ............................................................ 39

*United States v. Farley*,
   2 F.3d 645 (6th Cir. 1993) .................................................................. 20

*United States v. Flores*,
   230 F. Supp. 2d 138 (D. Mass. 2002) .................................... 30, 38, 39

*United States v. Gonzalez-Montoya*,
   161 F.3d 643 (10th Cir. 1998) ............................................................ 43

*United States v. Hall*,
   653 F.2d 1002 (5th Cir. 1981) ............................................................ 23

*United States v. Harrell*,
   737 F.2d 971 (11th Cir. 1984) ............................................................ 12

*United States v. Johnson*,
  261 Fed. Appx. 611 (4th Cir. 2008) ................................................... 38

*United States v. Jones*,
  308 F.3d 425 (4th Cir. 2002) ...................................................... 38, 40

*United States v. Jones*,
  965 F.2d 1507 (8th Cir. 1992) .......................................................... 39

*United States v. Lovern*,
  293 F.3d 695 (4th Cir. 2002) ............................................................ 36

*United States v. Madrigal*,
  422 Fed. Appx. 278 (4th Cir. 2011) .................................................. 38

*United States v. Manganellis*,
  864 F.2d 528 (7th Cir. 1988) ............................................................ 13

*United States v. Moreland*,
  437 F.3d 424 (4th Cir. 2006) ............................................................ 38

*United States v. Meeks*,
  857 F.2d 1201 (8th Cir. 1988) ..................................................... 12-13

*United States v. Perez*,
  661 F.3d 189 (4th Cir. 2011) ............................................................ 37

*United States v. Olano*,
  507 U.S. 725, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993) ..... 24, 28, 30

*United States v. Quinn*,
  359 F.3d 666 (4th Cir. 2004) ............................................................ 40

*United States v. Robinson*,
  275 F.3d 371 (4th Cir. 2001) ................................................. 11, 26, 33

*United States v. Sherpa*,
  110 F.3d 656 (9th Cir. 1996) ............................................................ 42

*United States v. Smith*,
    62 F.3d 641 (4th Cir. 1995) ................................................................ 40

*United States v. Westbrook*,
    896 F.2d 330 (8th Cir. 1990) ...................................................... 12, 13

*United States v. Wilson*,
    114 F.3d 429 (4th Cir. 1997) ............................................................ 38

*United States v. Young*,
    470 U.S. 1, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985) .......................... 27

*Weatherford v. Bursey*,
    429 U.S. 545, 97 S. Ct. 837, 51 L. Ed. 2d 30 (1997) ........................ 20

## STATUES

18 U.S.C. § 3231 ...................................................................................... 1

18 U.S.C. § 3553(f) ............................................................................ 41, 42

18 U.S.C. § 3553(f)(5) ............................................................................ 43

18 U.S.C. § 3742(a) .................................................................................. 1

21 U.S.C. § 841(a)(1) ...................................................................... 1, 2, 4, 7

28 U.S.C. § 1291 ...................................................................................... 1

## RULES

Fed. R. Civ. P. 51(d)(2) ...........................................................23-24, 28, 30

Fed. R. Crim. P. 16 .......................................................................... 16, 18, 21

Fed. R. Crim. P. 16(a)(1)(E) ................................................................. 18

Fed. R. Crim. P. 29 ................................................................................ 30

Fed. R. Crim. P. 33 ................................................................................ 34

Fed. R. Evid. 103(d)...................................................... 24, 28, 30

Fed. R. Evid. 401 ......................................................... 14, 23, 28

Fed. R. Evid. 402 ................................................................. 28

Fed. R. Evid. 403 ............................................................. 15, 28

Fed. R. Evid. 801(c)............................................................. 23

## **GUIDELINE**

U.S.S.G. § 3C1.1................................................................ 40

## **OTHER AUTHORITIES**

ABA Standards for Criminal Justice § 3-5.8(b) ........................... 26

Black's Law Dictionary (5th ed. 1979) ...................................... 22

Madison Park, *90 Percent of U.S. Bills Carry Traces of Cocaine*,
CNN (Aug. 14, 2009), http://articles.cnn.com/2009-08-
14/health/cocaine.traces.money_1_cocaine-dollar-bills-paper-
bills?_s=PM:HEALTH (last visited May 30, 2012).................................... 14

"Guidance for Prosecutors Regarding Criminal Discovery,"
Ogden Memo ...................................................................... 21

U.S.A.M. § 9-5.001(B) ........................................................... 19

U.S.A.M. § 9-5.001(B)(2).......................................................... 19

U.S.A.M. § 9-5.001(C) ........................................................... 19

U.S.A.M. § 9-5.001(C)(2).......................................................... 20

U.S.A.M. § 9-5.001(C)(3).......................................................... 20

U.S.A.M. § 9-5.001(D) ................................................................ 20

U.S.A.M. § 9-5.001(D)(1) ........................................................... 20

U.S.A.M. § 9-5.001(D)(2) ........................................................... 21

## JURISDICTIONAL STATEMENT

This is a direct appeal of a judgment in a criminal case entered February 8, 2012 imposing a prison sentence of 151 months upon Barry Adkins' conviction for conspiracy to distribute and distribution of 1000 or more kilograms of marijuana in violation of 21 U.S.C. § 841(a)(1) (JA 475). Jurisdiction was conferred upon the United States district court for the southern district of West Virginia (Chambers, J.) by 18 U.S.C. § 3231. Appellate jurisdiction is conferred upon the United States Court of Appeals for the Fourth Circuit by 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291. Adkins timely filed a notice of appeal on February 21, 2012 (JA 849-850). This appeal follows.

## STATEMENT OF THE ISSUES

1.    Whether the district court erred by denying defendant's motion *in limine* concerning the bank teller and admitting the testimony of the bank teller concerning the smell of marijuana.

2.    Whether the district court erred by failing to order the United States to produce the Suspicious Activity Report.

3.    Whether the district court erred by admitting hearsay testimony from case agent Bevins.

1

4.      Whether the district court erred by admitting Bevins' opinion testimony concerning the credibility of the government informants.

5.      Whether the district court erred by admitting evidence that Adkins resided on Kingpin Lane.

6.      Whether the district court erred by finding that the evidence was sufficient to support a finding that Adkins was guilty of conspiracy to distribute and distribution of more than 1000 kilograms of marijuana.

7.      Whether the district court erred by denying Adkins' motions for a new trial.

8.      Whether the district court made certain errors at sentencing, including attributing to Adkins more than 1000 kilograms of marijuana; imposing an enhancement for obstruction of justice; and denying the safety valve to Adkins.

## <u>STATEMENT OF THE CASE</u>

The United States indicted Barry Adkins on July 27, 2010 (JA 18-23) and filed a superseding indictment on January 11, 2011 (JA 103-110) charging that he distributed and conspired to distribute more than 1000 kilograms of marijuana in violation of 21 U.S.C. § 841(a)(1).  Trial commenced September 7, 2011.  The jury returned a verdict against Adkins the next day, September 8, 2011 (JA 475).  The Court sentenced Adkins on

February 6, 2012 to 151 months in prison followed by a period of supervised probation of 60 months and imposed special conditions of supervision including drug treatment, counseling, and testing (JA 602-607). Judgment was rendered against Adkins on February 8, 2012 in the amount of $4,860,000, for which he is jointly and severally liable with the other co-conspirators in this case (JA 608-610). The Court directed that all interests of Adkins in and to the $60,145 identified as a substitute asset be forfeited to the United States and used to offset the $4,860,000 judgment (Id.).

Adkins filed a motion for a new trial on October 5, 2011 (JA 542-547). The motion was denied by order entered February 2, 2012 (JA 561-563). Adkins then filed a second motion for a new trial on February 21, 2012 (JA 849-850), which was denied by order entered March 9, 2012 (JA 853-856). As a result of the United States' refusal to produce a certain Suspicious Activity Report concerning bank teller Martha Brown, Adkins filed a motion to compel production on May 18, 2012 (JA 864-906). On May 31, 2012, the district court denied the motion on jurisdictional grounds because this appeal is pending (JA 909-910). But, this Court noted that the district court retains jurisdiction to supplement the record (*United States v. Akins*, Record No. 12-4184, R. 25). Adkins thereafter filed a motion to

3

Supplement Record, and after a response, he also filed a reply brief (JA 911-939).  After reviewing the document *in camera*, the district court denied the motion on July 10, 2012 and directed the Clerk to file the SAR under seal (JA 941-942).  Adkins then filed a motion to Unseal Suspicious Activity Report with this Court (*United States v. Akins*, Record No. 12-4184, R. 28), which after a response and a reply, this Court denied on August 1, 2012 (*Id.* at R.32).

## STATEMENT OF FACTS

Count 2 of the superseding indictment charged that "[f]rom in or about Summer of 2002, to on or about May 19, 2010, at or near Huntington, Cabell County, West Virginia, within the Southern District of West Virginia" . . .  "[Adkins] knowingly conspired to commit offenses in violation of 21 U.S.C. § 841(a)(1), that is, knowingly and intentionally to distribute 1,000 kg or more of marijuana, a Schedule I controlled substance" (JA 105).  The events giving rise to the indictments began when DEA special agent Tom Bevins began "an investigation into a marijuana trafficking organization in Putnam County, Cabell County, West Virginia" (JA 323 at ¶¶ 18-21).  First, Marty McKnight was pulled over by the Putnam county sheriff's department and was found to have marijuana in his possession (JA 323 at ¶¶ 23-25; 258 at ¶¶ 1-4).  He named Crager as his

4

"source of supply" in hopes that his "sentence [would] be lower down the road" (JA 324 at ¶¶ 5-22). According to Bevins, "the first person on the bus sometimes gets the best seat" (JA 341 at ¶¶ 7-8). Crager then was set up to receive money owed to him from McKnight (JA 325 at ¶¶ 3-7). Later, Crager agreed to act as a confidential informant in hopes of receiving a lesser sentence (JA 325 at ¶¶ 17-20). He identified Young, who again acted as an informant, to have his sentence lowered (JA 325 at ¶¶ 21-25; 326 at ¶¶ 1-2; 334 at ¶¶ 24-25; 335 at ¶¶ 1-4). He also named Wheeler as his source and set up Wheeler to receive money from a "drug debt" (JA 327 at ¶¶ 1-14). Wheeler "began to cooperate as soon as [Bevins] approached him in the front door" (JA 328 at ¶¶ 18-20). Wheeler named Adkins as an individual to whom he sold marijuana (JA 329 at ¶¶ 18-12). At the direction of law enforcement, Wheeler arranged a meeting with Adkins to collect a previous debt (JA 329 at ¶ 25; 264 ¶¶ 1-6). When Adkins's phone records were obtained (JA 348 at ¶¶ 13-14), the only relevant evidence obtained were phone calls from Wheeler and Adkins (JA 349 at ¶¶ 22-25; 350 at ¶¶ 1-3) setting "up a meeting [like this one] to pay money at the BW3's" for some debt owed by Adkins to Wheeler (JA 361 at ¶¶ 9-19). Further, Adkins was nicknamed "the bookie," and made bets with Wheeler (JA 346 at ¶¶ 14-22). Wheeler also testified that he knew Adkins "though booking bets with him"

(JA 433 at ¶¶ 22-25). Wheeler collected money from Adkins on September 28, 2009, September 30, 2009, and October 16, 2009 (JA 331 at ¶¶ 2-4, 19-20; 332 at ¶¶ 9-11).

After Wheeler received money from Akins, a search warrant for Adkins's residence was executed in November 2009 (JA 333 at ¶¶ 2-4). During the search, $55,000 was found in a safe in the garage, which Bevins reported at trial smelled of marijuana (JA 333 at ¶¶ 9-19). However, Bevins did not record this information in his ROIs nor were the contents or the safe ever tested for marijuana residue (JA 340 at ¶¶ 23-25; 341 at ¶¶ 1-25; 342 at ¶¶ 1-3). Eight months later, the United States indicted Adkins for knowingly conspiring to distribute 1,000 kg or more of marijuana (JA 18). Adkins was arrested on July 28, 2010 and released later that day on bond (JA 35-37).

Thereafter, the parties entered the discovery phase of the proceedings, during which Joy Sebastian represented Adkins. With respect to the July 27, 2009 indictment, the government forwarded discovery to Adkins' attorney on August 31, 2010 (JA 57-66). Supplemental responses to requests for discovery were filed by the United States on September 28, 2010, October 4, 2010, October 25, 2010, December 8, 2010, December 13, 2010, December 28, 2010, and January 6, 2011 (JA 67-87, and 90-102). Then, the United States indicted Adkins for the same crime and alleged that he "knowingly

conspired to commit offenses in violation of 21 U.S.C. § 841(a)(1), that is, knowingly and intentionally to distribute 1,000 kg or more of marijuana" on January 11, 2011 (JA 105).  Adkins was arrested on January 18, 2011 on the superseding indictment and released on his previous bond (JA 21, R. 219). Thereafter, the United States filed supplemental discovery responses on January 28, 2011, February 1, 2011, February 14, 2011, February 18, 2011, February 25, 2011, March 2, 2011, March 11, 2011, March 28, 2011, April 8, 2011, May 12, 2011, May 16, 2011, June 1, 2011, and August 31, 2011 (JA 122-147, 150-162, 165-186, 211-215, and 230-232).

Yet, the government never informed Adkins of its intentions to use Martha Brown, a bank teller, as a witness until September 1, 2011, at approximately 12:30 pm — just two business days prior to trial (JA 542 ¶ 1). Adkins produced his own witness list on August 31, 2011 (supplemented September 2, 2011) (JA 24 at R. 403; 26 at R. 472) and filed on September 2, 2011 a motion to exclude the bank teller's testimony due to the government's late disclosure (JA 233-235).  This motion was denied on September 7, 2011 — the first day of trial (JA 236).  The government claimed that it discovered Martha Brown as a witness when it "learned of a suspicious activity report that had been filed by the bank" in July 2011,

7

which was filed during the indictment period (JA 242 at ¶¶ 20-25; 243 at ¶¶ 1-2).

The report of investigation that was produced concerning Ms. Brown indicated that "approximately two years ago" Ms. Brown began to notice that cash deposits made by Barry Adkins had a strong odor of marijuana, but she did not indicate on how many occasions this supposedly happened (JA 49). Additionally, she testified at trial that she only knew of the smell of marijuana because of statements made by police on previous occasions when they deposited money at the bank (JA 397 at ¶¶ 19-25; 397 at ¶¶ 1-2). Further, Brown was the only witness, other than the case agent, who was not a government informant.

Trial began September 7, 2011 and concluded the following day. Adkins was found guilty on Count 2 of the superseding indictment (JA 475). As stated, the Court sentenced Adkins on February 6, 2012 to 151 months in prison followed by a period of supervised probation of 60 months and special conditions of supervision including drug treatment, counseling, and testing (JA 602-607).

Further detailing of facts is reserved for argument.

## <u>SUMMARY OF ARGUMENT</u>

Adkins did not receive a fair trial.  Adkins was convicted of knowingly and intentionally distributing 1,000 kg or more of marijuana even though he was never found with *any* marijuana.  Further, the contents of the safe seized from his home were never tested for marijuana residue. Moreover, case agent Bevins testified only to recovering "approximately 90 grams of marijuana from" McKnight (JA 324 at ¶¶ 1-4), "a substantial amount of marijuana" that Young was charged with later in Cabell County (JA 327 at ¶¶ 15-22), and "several pounds of marijuana" from Wheeler's residence (JA 325 at ¶¶ 13-17).  Also, the district court in sentencing Adkins incorrectly imposed an enhancement for obstruction of justice and denied the safety valve to Adkins.

The district court also improperly permitted Brown to testify concerning the smell of marijuana even though she had never used or smelled the drug.  Furthermore, it erred by failing to order the United States to produce the Suspicious Activity Report.  Additionally, the district court improperly allowed the admission of hearsay evidence and permitted a government agent to vouch for the credibility of the government informants in patent contravention of federal law.  In short as stated, Barry Adkins did not receive a fair trial.

9

## <u>ARGUMENT AND AUTHORITIES</u>

**I.    THE DISTRICT COURT ERRED BY DENYING
DEFENDANT'S MOTION IN LIMINE CONCERNING THE
BANK TELLER AND ADMITTING THE TESTIMONY OF
THE BANK TELLER CONCERNING THE SMELL OF
MARIJUANA.**

The district court erred by permitting bank teller Martha Brown to

testify concerning the smell of marijuana on cash deposits made at Adkins'

bank.  Pursuant to the district court's order of May 31, 2011 (JA 23, R. 378)

the United States was ordered to file its witness list by August 31, 2011 (Id.).

It did not.  Instead, the United States filed its witness list on September 8,

2011 — the second day of trial (see JA 25, R. 425).  Adkins' trial counsel

first learned that the United States intended to call the bank teller on

September 1, 2011 — two business days before trial (JA 542 ¶ 1).  As a

result, Adkins filed a motion in limine seeking to exclude the evidence (JA

233-235).

On the morning of trial — September 7, 2011 — the district court did

not rule but stated

> Well, at this point I don't think I'm really informed sufficiently
> enough about how it is she determine the smell of marijuana to
> make a judgment about it.  If you do intend to use her, then
> before you make reference to her testimony, I think we need to
> have her testify out of the presence of the jury to explain the
> basis by which she claims she knows the smell of marijuana, all
> right.

(JA 244 at ¶¶ 1-7). Adkins objected and argued that the evidence was irrelevant and untimely (Id. page 6). Later that day during trial, a conference in chambers was held concerning Brown's testimony (JA 395-401). Adkins again objected and argued that the evidence was not relevant and that Brown was basing her lay opinion on hearsay statements made by police officers (JA 400 at ¶ 25; 401 ¶¶ 1-18; 402 at ¶ 14). The district court nevertheless permitted Brown to testify (JA 402 at ¶¶ 4-13).

The district court erred by admitting the bank teller's testimony. The appellate court will review a district court's evidentiary rulings for abuse of discretion. *See*, *e.g.*, *United States v. Robinson*, 275 F.3d 371, 383 (4th Cir. 2001).

First, Ms. Brown's sole knowledge concerning the smell of marijuana was based on hearsay statements by police officers in the distant past. The United States offered no evidence whatsoever that Brown had ever used or had any personal experience with the drug. As the Court properly noted, the Court's "biggest concern" was that "her opinion [as] a lay witness is based on things that the police have told her" (JA 401 ¶¶ 15-18). Despite its concern, the district court permitted the bank teller to testify over Adkins' objection (JA 402 at ¶¶ 4-14). As a result, Adkins was convicted (JA 475).

In response to Adkins' motion for a new trial (JA 542-547), the Court cited *United States v. Westbrook*, 896 F.2d 330 (8th Cir. 1990) in support of its earlier ruling (JA 562). *Westbrook*, however, is inapt. In *Westbrook* the witnesses were permitted to testify only because they were previous drug users (*Id*. at 335-336). "Both witnesses stated that they had used the substance, described its effects, and said that it was amphetamine" (*Id.* at 335). With respect to another witness who "had no prior experience with amphetamine" who was permitted nevertheless to offer her opinion that the substance she consumed was amphetamine, the Eight Circuit "agree[d] with appellant that the government did not properly establish a foundation for her opinion and that her statement should not have been admitted" (*Id*. at 336).

Similarly here, the bank teller's testimony should have been excluded. In the case at bar, the United States offered no evidence that the bank teller had ever used marijuana or had any personal experience with the drug. In *Westbrook* the court noted that circumstantial evidence of drug identification may be used *only* where the witness has "present experience with the substance in question,"

> Circumstantial evidence of a drug's identity may include opinion testimony of a witness who couples past use with present experience with the substance in question. *United States v. Harrell*, 737 F.2d at 978-79. Circumstantial evidence may also include the name by which members of a conspiracy referred to the substance. *United States v. Meeks*, 857 F.2d at

1204.  *See also United States v. Manganellis*, 864 F.2d 528 (7th Cir. 1988).

(*Id*.).

As stated, Brown had no history of past use nor did she overhear a name by which members of a conspiracy referred to the substance or smell. In fact, the facts of the case at bar are much weaker than the facts in *Westbrook*.  Remarks from police officers while conducting business at a bank is a far cry from "an amphetamine aficionado [offering] lay opinion comparing powdery substance of unknown provenance."  *King v. Rumsfeld*, 328 F.3d 145, 158 (4th Cir. 2003).  The foundation for admission of the evidence in question in Adkins' case was therefore insufficient, and the evidence should have been excluded.

Next, Brown testified that Adkins deposited money with her seven or eight times (JA 405 at ¶¶ 18-20).  Yet, had the defense had time to prepare for Brown's testimony, Adkins would have called employee Donald Keith Bazell to testify that he made ninety percent of the bank deposits to the account in question for the company.  Additionally, contrary to Brown's testimony, the deposits actually made were smaller amounts and not all in cash.  For instance, on December 24, 2007, Martha Brown received a $425.60 check deposit (JA 842).  On June 16, 2008, Ms. Brown received a $150 cash deposit (JA 843).  On January 16, 2009, Ms. Brown received a

$400 cash plus $269.88 check deposit (JA 844). On July 2, 2009, Ms.

Brown received a $500 cash deposit (Id.). On September 2, 2009, Ms.

Brown received a $100 cash deposit (Id.). Of the remaining six deposits,

four were approximately half cash and half checks, and none of the cash

deposits were close to $4,000 (JA 843-844).

Further, Brown's testimony, even if it had been entirely accurate, was

irrelevant to the crime charged. Under Fed. R. of Evid. 401 "[e]vidence is

relevant if: it has any tendency to a make fact more or less probable than it

would be without the evidence; and the fact is of consequence in

determining the action." First, the presence of traces of controlled drugs on

paper money is hardly probative of whether a particular defendant is guilty

of distribution: "90 percent of paper money circulating in U.S. cities

contains traces of cocaine." Madison Park, *90 Percent of U.S. Bills Carry*

*Traces of Cocaine*, CNN (Aug. 14, 2009), http://articles.cnn.com/2009-08-

14/health/cocaine.traces.money_1_cocaine-dollar-bills-paper-

bills?_s=PM:HEALTH (last visited May 30, 2012). The odor of marijuana

on the money could have come from many sources, including periodic rent

payments received from tenants. Second, it does not make it any more

probable that Adkins is guilty of the crime charged since Mr. Bazell was the

individual who deposited most of the money for the company. Accordingly, the district court should have granted the motion in limine.

The motion in limine should also have been granted because any probative value was substantially outweighed by the danger of unfair prejudice. Fed. R. of Evid. 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." In this case, admission of Brown's testimony was a waste of time, confused the issues, and was unfairly prejudicial because the odor of marijuana could have been attributed to anyone who handled the money, including tenants, and as stated, Bazell deposited most of the money for the company. This evidence no doubt misled the jury by diverting its attention away from the issue in this case — that is, whether Adkins was knowingly part of a conspiracy to distribute marijuana.

Moreover, as stated, Brown was disclosed by the government only two business days prior to trial. Counsel therefore did not have time to prepare for her testimony. It took extraordinary effort *after* trial to piece together the bank records that had been seized and withheld by the United

15

States.  Further as stated, in light of the government's untimely disclosure,

Adkins did not have time to subpoena Bazell for trial.

## II.   THE DISTRICT COURT ERRED BY FAILING TO ORDER THE UNITED STATES TO PRODUCE THE SUSPICIOUS ACTIVITY REPORT.

The government had an affirmative duty under Rule 16, *Brady*, and

*Giglio* to disclose the Suspicious Activity Report (JA xiii).  Adkins ensured

that the government understood its duty by endorsing the Arraignment Order

and Standard Discovery Requests Form entered on January 20, 2011 (JA

111-116).  The government failed to produce the document (JA 906-907).

For reasons stated *infra*, the district court erred by not ordering the United

States to produce the Suspicious Activity Report under Fed. R. Crim. P. 16,

*Brady*, and *Giglio*.

The Supreme Court in *Brady* held "that the suppression by the

prosecution of evidence favorable to an accused upon request violates due

process where the evidence is material either to guilt or punishment,

irrespective of the good faith or bad faith in the prosecution."  373 U.S. at

87.  Appellate courts review preserved challenges to conclusions of law *de

novo*, particularly with respect to constitutional claims, affording no

deference to the trial judge's decision.  *See*, *e.g.*, *First Options of Chi., Inc v.

Kaplan*, 514 U.S. 938, 947-48 (1995).

16

The government failed to produce the SAR concerning Martha Brown in patent contravention of its well-established duty.

On the first day of trial — September 7, 2011 — the United States disclosed for the first time that it had received a "suspicious activity report" (SAR) concerning bank teller Martha Brown two months earlier. The colloquy between the district court and AUSA Monica Dillon on the morning of the first day of trial is as follows,

> THE COURT:    Can you explain how the Government learned about this witness, when and under what circumstances?
> MS. DILLON:    Your, Honor, in July of this year we learned of a suspicious activity report that had been filed by the bank and through that investigation were able to identify that there was a teller there that had caused that SAR to be filed. It took us a little bit to finally be able to identify Miss Brown.
> THE COURT:    What prompted this suspicious activity report in – July of this year?
> MS. DILLON:    It was filed previously. It was filed during the time period that we're discussing in --- during the indictment.[1] I didn't become aware of it – we did not become aware of it until July of this year.

(JA 242 at ¶¶ 20-25; 243 at ¶¶ 1-8).

Thus, according to the United States, it plainly had the suspicious activity report no later than July 2011 — two months before trial. As will be

---

[1] It is not clear what the United States meant when it stated that the SAR was "filed previously … during the indictment" (JA 243 at ¶¶ 5-7). Review of the district court docket sheet indicates that the report has never been filed.

17

shown, the United States plainly should have provided the report to the

defense prior to trial but did not.

Informing Fed. R. Crim. P. 16, *Brady* and *Giglio*, the district court

entered several pre-trial orders compelling the United States to provide

discovery, including the suspicious activity report.  For example, by order

dated January 20, 2011 (JA 114), the district court ordered the United States

to,

> e.     Permit the defendant to inspect and to copy or
> photograph books, papers, documents, data, photographs,
> tangible objects, buildings or places, or copies or portions of
> any of these items, if the item is within the government's
> possession, custody, or control, and (1) the item is material to
> preparing the defense; (ii) the government intends to use the
> item in this case in chief at trial; or (iii) the item was obtained
> from or belongs to the defendant. [F. R. Cim. P. 16(a)(1)(E)].
>                          .     .     .
>
> h.     Disclose to defendant all evidence favorable to
> defendant, including impeachment evidence, and allow
> defendant to inspect, copy or photograph such evidence.

(JA 114).

The United States obligation to produce the SAR is summarized

plainly in the United States Attorney's Criminal Research Manual.

According to the Manual (JA 874-883),

> **B.     Constitutional obligation to ensure a fair trial and
> disclose material exculpatory and impeachment evidence.**
> Government disclosure of material exculpatory and
> impeachment evidence is part of the constitutional guarantee to

18

a fair trial. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972). The law requires the disclosure of exculpatory and impeachment evidence when such evidence is material to guilt or punishment. *Brady*, 373 U.S. at 87, *Giglio*, 405 U.S. at 154. Because they are Constitutional obligations, *Brady* and *Giglio* evidence must be disclosed regardless of whether the defendant makes a request for exculpatory or impeachment evidence. *Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995).

U.S.A.M. § 9-5.001(B); (JA 874-875).

The obligation extends not only to prosecutors, but to every member

of the prosecution team,

> **2.      The prosecution team**. It is the obligation of federal prosecutors, in preparing for trial, to seek all exculpatory and impeachment information from all the members of the prosecution team. Members of the prosecution team include federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant. *Kyles*, 514 U.S. at 437.

U.S.A.M. § 9-5.001(B)(2); (JA 875).

The disclosure of exculpatory and impeachment information extends

"beyond that which is constitutionally and legal required." The obligation

"requires disclosure by prosecutors of information beyond that which is

'material' to guilt as articulated in *Kyles v. Whitley*, 514 U.S. 419 (1995),

and *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999)." U.S.A.M.

§ 9-5.001(C); (JA 875). The United States plainly had an obligation to

19

produce impeachment information "regardless of whether the information

subject to disclosure would itself constitute admissible evidence,"

> **2.     Additional impeachment information that must be
> disclosed**.  A prosecutor must disclose information that either
> casts a substantial doubt upon the accuracy of any evidence —
> including but not limited to witness testimony—the prosecutor
> intends to rely on to prove an element of an crime charged, or
> might have a significant bearing on the admissibility of
> prosecution evidence.  This information must be disclosed
> regardless of whether it is likely to make the difference between
> conviction and acquittal of the defendant for a charged crime.

> **3**.     **Information**.  Unlike the requirements of Brady and its
> progeny, which focus on evidence, the disclosure requirement
> of this section applies to information regardless of whether the
> information subject to disclosure would itself constitute
> admissible evidence.

U.S.A.M. §§ 9-5.001(C)(2) and (3); (JA 876).

Regarding the timing of disclosure,

> **D.     Timing of disclosure**.  Due process requires that
> disclosure of exculpatory and impeachment evidence material
> to guilt or innocence be made in sufficient time to permit the
> defendant to make effective use of that information at trial.
> *See*, *e.g. Weatherford v. Bursey*, 429 U.S. 545, 559 (1997);
> *United States v. Farley*, 2 F.3d 645, 654 (6th Cir. 1993).  In
> most cases, the disclosures required by the Constitution and this
> policy will be made in advance of trial.

U.S.A.M. § 9-5.001(D); (JA 876).

The Manual further provides that "[e]xculpatory information must be

disclosed reasonably promptly after it is discovered" (U.S.A.M.

§ 9-5.001(D)(1)); (JA 876).  The United States must disclose impeachment

information "at a reasonable time before trial" (U.S.A.M. § 9-5.001(D)(2));
(JA 876).

The United States' obligation to produce discovery is further set forth
in the "Memorandum for Department Prosecutors" from Deputy Attorney
General David W. Ogden dated January 4, 2010 entitled "Guidance for
Prosecutors Regarding Criminal Discovery" ("the Ogden memo") and the
"Memorandum for Heads of Department Litigating Components Handling
Criminal Matters" from Ogden dated January 4, 2010 entitled "Requirement
for Office Discovery Policies in Criminal Matters" (JA 880-900). Further,
"the government has a continuing obligation to produce all evidence
required by the law and the Federal Rules of Criminal Procedure." *United
States v. Akinadewo*, (Criminal No. 11-150) (D.C. Dist. Columbia, June 1,
2011 (JA 902-904)).

In patent contravention of Fed. R. Crim. P. 16, the Supreme Court's
mandate, and the DOL's own directives, the United States failed and refused
to produce the suspicious activity report. Furthermore, the district court
erred by failing to order the United States to produce the SAR. The
Supreme Court in *Brady* held "that the suppression by the prosecution of
evidence favorable to an accused upon request violates due process where
the evidence is material either to guilt or punishment, irrespective of the

21

good faith or bad faith in the prosecution." (*Id.*, 373 U.S. at 87). The SAR is obviously "material to guilt or to punishment" as provided by *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). The United States told the district court on the first day of trial that "in July of this year we learned of a Suspicious Activity Report that had been filed by the bank [and] … *there was a teller that had caused that SAR to be filed*" (JA 941) [Emphasis added]. And in its order, the district court observed that the "SAR led the government to conduct an interview of Ms. Martha Brown, the bank teller who noticed the odor and caused the SAR to be filed" (Id.). Whether the bank teller "authored" the report as stated by the district court, she indisputably "caused [it] … to be filed," and it obviously concerned "suspicious activity" which led the United States to call her as a witness at trial. The report is therefore "material to guilt or punishment" and is discoverable. Further, notwithstanding the district court's characterization of the contents of the report as benign, to the extent the report does not mention the odor of marijuana on money or large cash deposits allegedly made by Adkins, the report also should have been produced under *Brady* and *Giglio*.

*Black's Law Dictionary* (5th Ed.) (1979) defines "material evidence" as evidence which has "a logical connection with the issue," (*citing*, *Barr v.*

*Dolphin Holding Corp.*, 141 N.Y.S.2d 906, 908 (1955) ("evidence is material when it has an effective influence or bearing on the question in issue"). Rule 401 of the Federal Rules of Evidence defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The Rule requires that (1) that the evidence must tend to prove the matter sought to be proved and (2) the matter sought to be proved must be one that is of consequence to the determination of the action. *United States v. Hall*, 653 F.2d 1002, 1005 (5th Cir. 1981). The SAR is therefore not only material, it is relevant. If the SAR is not material, then the district court should not have permitted the bank teller to testify.

## III.    THE DISTRICT COURT ERRED BY ADMITTING HEARSAY TESTIMONY FROM CASE AGENT BEVINS.

Federal Rules of Evidence Rule 801(c) provides that hearsay is "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."

The appellate court will review a district court's evidentiary rulings not properly preserved before the trial court for plain error. *See*, *e.g.*, FED.

R. Civ. P. 51(d)(2); Fed. R. Evid. 103(d); *United States v. Olano*, 507 U.S. 725, 732 (1993); *Johnson v. United States*, 520 U.S. 461, 466-67 (1997).

The Court erred by permitting Agent Bevins repeatedly to offer hearsay testimony, which as will be shown seriously undermined the fairness of Adkins's trial:

a. On September 7, 2011, on direct examination after being asked: "Did Mr. Wheeler provide any information about individuals he was selling to?" Agent Bevins responded: "Yes. He gave us — he advised that he had two primary individuals. He said Mr. Young and Mr. Barry Adkins, the defendant" (JA 329 at ¶¶ 7-12).

b. On September 7, 2011, on direct examination while discussing meetings between Wheeler and Adkins, Bevins verified the date of the first meeting, and then was asked: "On that occasion, they — the — Mr. Wheeler and Mr. Adkins met at BW3's here in Huntington, West Virginia, right across from the state courthouse. During that meeting, Mr. Adkins provided Mr. Wheeler $10,000 in cash" (JA 331 at ¶¶ 6-9). There is no evidence on the record that Agent Bevins witnessed this transaction.

c. On September 7, 2011, on redirect examination while discussing the search of Mr. Wheeler's house, counsel asked Agent Bevins about Mr. Young's court records found in Mr. Wheeler's house. In response to being

asked: "How did they end up at Mr. Wheeler's house?" Agent Bevins

responded: "They were believing — or it was thought by Mr. Wheeler that

Mr. Adkins was cooperating with the police department, and Mr. Adkins had

arranged for documents from Cabell County Courthouse to be sent to him

from his attorney." After being asked: "I'm sorry. Did you say

that — who — Mr. Wheeler believe who might be cooperating?"  Bevins

responded: "Mr. Young. I apologize" (JA 361 at ¶¶ 21-25; JA 362 at ¶¶ 1-3).

d. On September 7, 2011, on redirect examination while discussing

Mr. Young's arrest papers, after being asked: "And Mr. Wheeler had told

you that he received those — that paperwork from Mr. Adkins" Bevins

responded: "Yes. Mr. Wheeler became concerned because Mr. Young hadn't

paid a $41,000 debt, or approximately $40,000 debt, and he became

concerned that he was cooperating, and Mr. Adkins had agreed to provide

him with his paperwork" (JA 362 at ¶¶ 7-12).

e. On September 7, 2011, on redirect examination while discussing

sources, Bevins testified that "Mr. Wheeler — Mr. Wheeler supplied Mr.

Adkins drugs, but Mr. Dodson supplied Mr. Wheeler the drugs.  The

two — you don't want the two to meet because you're going to get cut out

somewhere along the line" (JA 362 at ¶¶ 21-24).

25

The above-referenced testimony was hearsay and should have been excluded.

## IV. THE DISTRICT COURT ERRED BY ADMITTING BEVINS' OPINION TESTIMONY CONCERNING THE CREDIBILITY OF THE GOVERNMENT INFORMANTS.

On September 7, 2011 on cross examination, Agent Bevins vouched for Wheeler's credibility stating that: "He was able to take me to Mr. Wheeler, where he lived — I mean Mr. Adkins, where he lived, and others. And he was able to give me such detail that I was able to verify, after I've interviewed several people, to *I believe he is being truthful and forthright about his marijuana conspiracy involvement*" (JA 344 at ¶¶ 23-25; 345 at ¶¶ 1-3)[Emphasis added].  Adkins noted that Bevins "vouched for Mr. Wheeler's credibility" (JA 345 at ¶ 4).  Yet, the Court did not strike the testimony.

The appellate court will review a district court's evidentiary rulings for abuse of discretion.  *See*, *e.g.*, *United States v. Robinson*, 275 F.3d 371, 383 (4th Cir. 2001).

"The prosecutor should not express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant."  ABA Standards for Criminal Justice *§ 3-5.8*(b).  The

Supreme Court has pointed to two main dangers of the prosecutor vouching

for the credibility of a witness:

> [S]uch comments can convey the impression that evidence not
> presented to the jury, but known to the prosecutor, supports the
> charges against the defendant and can thus jeopardize the
> defendant's right to be tried solely on the basis of the evidence
> presented to the jury; and the prosecutor's opinion carries with
> it the imprimatur of the Government and may induce the jury to
> trust the Government's judgment rather than its own view of
> the evidence.  See *Berger v. United States*, 295 U.S., at 88-89.

*United States v. Young*, 470 U.S. 1, 18-19 (1985).  Moreover,

"[p]rosecutorial statements of personal belief or disbelief in the testimony of

a witness have been held to be reversible error in the context of federal

prosecutions."  *See*, *e. g.*, *United States v. Corona*, 551 F.2d 1386, 1388-89

(5th Cir. 1977), *Hall v. United States*, 419 F.2d 582, 585-87 (5th Cir. 1977).

*Houston v. Estelle*, 569 F.2d 372, 377 n.8 (5th Cir. 1978).

It was patently improper for the prosecution team to vouch for the

credibility of the government's witness, and the evidence obviously should

have been excluded.

## V.    THE DISTRICT COURT ERRED BY ADMITTING EVIDENCE THAT ADKINS RESIDED ON KINGPIN LANE.

On September 8, 2011 on cross-examination, counsel asked Adkins:

"Your driveway at your house has 'Kingpin Lane' written in it, doesn't it?"

Mr. Adkins responded: "Excuse me?" Counsel again asked: "Your driveway

27

at your home has the words "Kingpin Lane" written in it, doesn't it?" Mr.

Adkins responded: "There's a — there's a sign that's up above my door that

says — that's a metal sign. It's not written. But, yeah, there is a sign that

says that, yes." Counsel again asked: "Kingpin Lane?" Mr. Adkins

answered: "Yes ma'am" (JA 539 at ¶¶ 23-25; 540 at ¶¶ 1-7).

The appellate court will review a district court's evidentiary rulings

not properly preserved before the trial court for plain error. *See*, *e.g.*, FED.

R. CIV. P. 51(d)(2); FED. R. EVID. 103(d); *United States v. Olano*, 507 U.S.

725, 732 (1993); *Johnson v. United States*, 520 U.S. 461, 466-67 (1997).

Fed. R. of Evid. 401 explains that "[e]vidence is relevant if: it has any

tendency to a make fact more or less probable than it would be without the

evidence; and the fact is of consequence in determining the action." Fed. R.

Evid. 402 states that "[i]rrelevant evidence is not admissible." Whether

Adkins had a sign at his home had no bearing on whether he conspired to

distribute marijuana. The sign is a decoration, not evidence of a conspiracy.

Furthermore, it is not alleged that Adkins was the "mastermind" of the

conspiracy. Evidence concerning the sign was irrelevant and therefore

should not have been admitted.

Further, any probative value was substantially outweighed by the

danger of unfair prejudice under Fed. R. of Evid. 403, which provides that

"[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  The evidence in question was extremely prejudicial.  Adkins was not an alleged ringleader of the conspiracy.  Further, the evidence misled the jury by focusing their attention on the sign, rather than the issues before the jury.

## VI.  THE DISTRICT COURT ERRED BY FINDING THAT THE EVIDENCE WAS SUFFICIENT TO SUPPORT A FINDING THAT ADKINS WAS GUILTY OF CONSPIRACY TO DISTRIBUTE AND DISTRIBUTION OF MORE THAN 1000 KILOGRAMS OF MARIJUANA.

The evidence was not sufficient to support a finding that Adkins was guilty of conspiracy to distribute and distribution of more than 1000 kilograms of marijuana.  All witnesses other than Agent Bevins and Martha Brown had felonies and received plea agreements.  Adkins was never found to possess *any* marijuana, and the contents of the safe were not tested for marijuana residue.  Additionally, there is no evidence whatsoever that the money in the safe came from drug sales, although the government informants knew that Adkins was a bookie.

When considering a sufficiency-of-the-evidence challenge to a guilty verdict, [the Court] must sustain the jury's verdict if it is supported by

29

substantial evidence. *Glasser v. United States*, 315 U.S. 60, 80, 62 S. Ct.
457, 86 L. Ed. 680 (1942). Adkins' trial counsel failed to make a Rule 29
motion for judgment of acquittal. The appellate court will review a district
court's evidentiary rulings not properly preserved before the trial court for
plain error. *See*, *e.g.*, Fed. R. Civ. P. 51(d)(2); Fed. R. Evid. 103(d); *United
States v. Olano*, 507 U.S. 725, 732 (1993); *Johnson v. United States*, 520
U.S. 461, 466-67 (1997).

The district court found that Adkins conspired to distribute more than
1000 kilograms even though no marijuana was ever found in his possession,
and the marijuana seized from co-conspirators was only several pounds.[2]
"Drug quantity is used as a proxy for culpability." *United States v. Flores*,
230 F. Supp. 2d 138, 141 (D. Mass. 2002). But, "[t]here are times when that
approach has given this Court — as well as others — pause, when, for
example, a street dealer is held responsible for the drugs distributed by
others over whom he had no control, whose activities he was only vaguely
aware of." (*Id.*).

---

[2] Case agent Bevins testified to recovering "approximately 90 grams of
marijuana from" McKnight (JA 324 at ¶¶ 1-4), "a substantial amount of
marijuana" that Young was charged with later in Cabell County (JA 326 at
¶¶ 15-22), and "several pounds of marijuana" from Wheeler's residence (JA
325 at ¶¶ 13-17).

Here, there was no evidence that Adkins controlled nor was anymore than vaguely aware of dealings with 1,000 kilograms or more of marijuana. The historical evidence is as follows:

First, Marty McKnight was found with 90 grams of marijuana when he was pulled over (JA 323 ¶¶ 24-25; 324 ¶¶ 1-4). He named a Craegar as his source (JA 323 at ¶ 24). Craeger was never found to have any marijuana in his possession. He was only set up to receive money from McKnight (JA 324 at ¶¶ 23-25; 325 at ¶¶ 1-7). Craeger identified Young as his source (JA 325 at ¶ 24). Agent Bevins testified that at some point Young provided the government marijuana during an undercover and was charged with that amount, but Young only testified to stipulating to 100 pounds in the conspiracy charge (JA 327 at ¶¶ 15-22; 384 at ¶ 25; 385 at ¶¶ 1-8). Young identified Wheeler as his source. Wheeler was determined to have several pounds of marijuana. Wheeler named Perry, and eventually Dodson, as his source. Wheeler identified Adkins not as his source, but just as an individual he sold to. Adkins was never found with any marijuana in his possession.

Perry acted as a go-between for Dodson and Wheeler for some time (JA 367 at ¶¶ 24-25; 368 at ¶¶ 18-19). However, he did not testify to dealing with Adkins. He only testified that he knew of Adkins, not that

31

Adkins knew of him or the amount of dealings he had with Wheeler or Dodson (JA 370 at ¶¶ 9-16). Again, there is no evidence that Adkins had more than mere knowledge, if even that, of those activities. Eventually, Perry was cut out of the picture, and Wheeler went straight to Dodson (JA 370 at ¶¶ 3-5).

Dodson testified to receiving a large amount of marijuana, roughly 11,000 pounds (JA 418 at ¶ 16). However, there is no evidence that Adkins even knew of these transactions because he did not interact with Dodson.

Young testified to receiving twenty-five pounds per transaction with Wheeler (JA 385 at ¶ 13). However, he was just an individual Wheeler sold marijuana to. There is no evidence that he had any dealings with Adkins or that Adkins knew of his transactions with Wheeler.

Wheeler testified to his own transactions in receiving marijuana, but when asked about Adkins knowledge of his source of supply, Wheeler responded: "Not too much at the time. I didn't tell him too much. I just told him where I got it from, in Zanesville." Wheeler was then asked: "Was Mr. Adkins aware of other customers that you had?" Wheeler responded: "No, not really; no, not — no" (JA 436 at ¶¶ 10-13). He testified that he knew of the amounts that he was receiving (JA 436 at ¶¶ 14-16). However, this is just mere knowledge of the activities of another individual. There is no

evidence that Adkins controlled or had knowledge of any more marijuana than what he received himself.  Wheeler only testified to giving Adkins sixty-five pounds on the last transaction, and he said that some of this was returned to him (JA 437 at ¶¶ 6-9).

Adkins should not have been attributed with 1,000 kilograms of marijuana when there is no evidence that he controlled this amount, nor was he even aware of most of the dealings with the other co-conspirators.

## VII.  THE DISTRICT COURT ERRED BY DENYING ADKINS' MOTIONS FOR A NEW TRIAL.

After the jury returned its verdict, Adkins filed a motion for a new trial as a result of the district court admitting Martha Brown's testimony (JA 542-547).  The district court denied the motion four months later (JA 561-563).  Adkins then filed a second motion for a new trial as a result of the late disclosure of Martha Brown and recovery of the bank records seized by the United States but withheld during discovery (JA 611-848).  Adkins objected to Brown's testimony before and during her testimony (JA 233-235; 241 at ¶¶ 12-25; 242 at ¶¶ 1-19; 400 at ¶ 25; 401 at ¶¶ 1-5, 15-17; 402 at ¶ 14).  The appellate court will review a district court's properly preserved evidentiary rulings for abuse of discretion.  *See*, *e.g.*, *United States v. Robinson*, 275 F.3d 371, 383 (4th Cir. 2001).

In determining whether a new trial should be granted under Rule 33 of the Federal Rules of Criminal Procedure on the basis of newly discovered evidence, this circuit utilizes a five-part test as described in *United States v. Chavis*, 880 F.2d 788, 793 (4th Cir. 1989). A motion for a new trial should be granted if: (1) the evidence is newly discovered; (2) the movant exercised due diligence in discovering the evidence; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material to the issues; and (5) the evidence would probably result in acquittal at new trial. (*Id*.).

First, the evidence was newly discovered. Brown was only disclosed as a witness two business days prior to trial. The Suspicious Activity Report, which led to discovering her as a witness, was never disclosed until the government mentioned it in its efforts to persuade the district court to permit Ms. Brown to testify. Additionally, defendant, defendant's former counsel, and defendant's trial counsel all submitted affidavits attesting to the fact that the bank records seized from Adkins' home were not returned or made available to the defense prior to trial (JA 615-616; 846-848; 851-852).

Second, the movant has been found to have exercised due diligence in discovering the evidence. The defendant Barry Adkins' Second Motion For A New Trial and attached affidavits "allege facts from which the Court can infer that the defendant has been diligent in gathering this evidence and

34

filing the instant motion," and therefore the Court found that "the second prong of the test is satisfied" (JA 854).

Third, the Court incorrectly determined that the evidence was merely cumulative or impeaching. Without having the opportunity to review the Suspicious Activity Report, it is unclear whether this evidence would be just merely cumulative or impeaching. Additionally, Martha Brown's testimony and the bank records, if disclosed in time, would have led Adkins to call Bazell to testify that he deposited money for the company in that account ninety-percent of the time.

Further, in contrast to the Court's finding, the spreadsheet compiled by the defendant is inconsistent with the bank teller's testimony (JA 842-845). The amount of cash that was deposited at one time was never close to $4,000 and many deposits were much lower. Further, checks were also often deposited with the cash, thus negating the government's claim that this was "drug money."

Fourth, the evidence is material. Brown's testimony was crucial to this case as demonstrated by the government's heavy reliance on the evidence during its summation. This evidence is material to Adkins' guilt or innocence of conspiring to distribute 1,000 or more kilograms of marijuana because the jury most likely relied on this evidence to convict Adkins.

35

Further, the bank records, the SAR, and Bazell would have contradicted the bank teller's testimony. Bazell would have testified that Adkins did not make most of the deposits. Further as stated, Brown was the only witness (other than the case agent) without a felony record and a plea agreement. Brown was therefore a crucial witness for the government; she was the government's only truly "credible" witness.

Fifth, the evidence would probably result in acquittal at new trial. The government simply will not produce the SAR; a permissible inference therefore is likely it contains information that would result in acquittal at a new trial. Further, error is only harmless if "it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *United States v. Lovern*, 293 F.3d 695, 701 (4th Cir. 2002). As the court notated, all of the other evidence in this case was provided by co-conspirators (JA 855-856). The fact that all of the other witnesses were co-conspirators highlights the importance of Brown's testimony because the testimony of all of the other witnesses was purchased for a price.

**VIII. THE DISTRICT COURT MADE CERTAIN ERRORS AT SENTENCING, INCLUDING ATTRIBUTING TO ADKINS MORE THAN 1000 KILOGRAMS OF MARIJUANA; IMPOSING AN ENHANCEMENT FOR OBSTRUCTION OF JUSTICE; AND DENYING THE SAFETY VALVE TO ADKINS.**

The district court attributed more than 1000 kilograms to Adkins even though no marijuana was ever found in his possession, and all of the marijuana seized from co-conspirators totaled several pounds.  Adkins objected to being attributed with this amount in his objections to the presentence report (JA 571 at ¶¶ 21-25; 572 at ¶¶ 1-5; 577 at ¶¶ 10-12; 579-582).  "The appellate courts conduct a reasonableness inquiry coupled with an abuse-of-discretion standard of review to determine whether a sentence imposed by a district court was proper."  *United States v. Perez*, 661 F.3d 189, 192 (4th Cir. 2011) (citing *Gall v. United States*, 552 U.S. 38, 46, 128 S. Ct. 586, 169 L. Ed. 2d 445 (2007); *United States v. Carter*, 564 F.3d 325, 328 (4th Cir. 2009)).

The government also requested an enhancement for obstruction of justice on the grounds that Adkins testified and the jury returned a guilty verdict (JA 573-577).  Adkins objected to the enhancement but the district court enhanced his sentence finding that Adkins lied because the jury found him guilty and the court agreed.  (Id.).  "[F]indings of fact are subject to a clearly erroneous standard, and the court's interpretation of the sentencing

37

guidelines is reviewed *de novo*." *United States v. Johnson*, 261 Fed. Appx. 611, 614 (4th Cir. 2008) (citing *United States v. Moreland*, 437 F.3d 424, 433 (4th Cir. 2006), *United States v. Jones*, 308 F.3d 425, 427 (4th Cir. 2002).

Additionally, even though Adkins requested to speak with the government to discuss the possibility of applying the safety valve, the district court denied his request for the benefit of the safety valve (JA 563-570). "A district court's determination of whether a defendant has satisfied the safety valve criteria is a question of fact reviewed for clear error." *United States v. Madrigal*, 422 Fed. Appx. 278, 280 (4th Cir. 2011) (citing *United States v. Wilson*, 114 F.3d 429, 432 (4th Cir. 1997)).

First, as stated *supra*, the district court attributed more than 1000 kilograms to Mr. Adkins even though no marijuana was ever found in his possession, and the total weight of marijuana seized from co-conspirators was "approximately 90 grams of marijuana from" McKnight (JA 324 at ¶¶ 1-4), "a substantial amount of marijuana" that Young was charged later with in Cabell County (JA 327 at ¶¶ 15-22), and "several pounds of marijuana" from Wheeler's residence (JA 325 at ¶¶ 13-17). "Drug quantity is used as a proxy for culpability." *United States v. Flores*, 230 F. Supp. 2d 138, 141 (D. Mass. 2002). But, "[t]here are times when that approach has

38

given this Court — as well as others — pause, when, for example, a street dealer is held responsible for the drugs distributed by others over whom he had no control, whose activities he was only vaguely aware of." (*Id.*). In fact, "under the Guidelines' standard, mere knowledge of the activities of another is not enough to make a defendant liable for that dealer's other's activities." (*Id.* at 142 (citing *United States v. Jones*, 965 F.2d 1507, 1517 (8th Cir. 1992))).

> Rather, the Guidelines expressly limit the responsibility of each participant to the scope of *his own agreement*. *See United States v. Edwards*, 945 F.2d 1387 (7th Cir. 1991). There may well be instances in which the defendant is convicted of being a member of a broad conspiracy, a conspiracy which distributed large amounts of drugs, but is held responsible at sentencing for a smaller amount because he only agreed to jointly undertake the distribution of that amount.

(*Id.* at 143).

For reasons stated *supra*, the evidence was insufficient to support a finding that Adkins is responsible for 1,000 kilograms of marijuana.

Second, the district court erred by imposing an enhancement for obstruction of justice. The Government requested the enhancement based on Adkins testimony because the jury found him guilty:

> [W]hen he was asked by his attorney specifically 'Barry, were you dealing marijuana for Brad or yourself,' he answered, 'No.' The second question from his attorney was, 'What was your relationship with Brad always?' Answer: 'Strictly taking bets from him.'

39

(JA 573 at ¶¶ 16-21). The Government argued "that based on the finding of the jury, which was guilty, that that testimony was perjurious" (JA 573 at ¶¶ 22-24). The Court found that Mr. Adkins received "the two-point enhancement . . . for the reasons stated in the presentence report" (JA 577 at ¶¶ 8-9).

Appropriate application of this enhancement is for defendants who commit perjury during the course of his or her prosecution. U.S.S.G. § 3C1.1, comment. (n.1 & 4(b)). "Application of this enhancement is appropriate if the sentencing court finds that 'the defendant when testifying under oath (1) gave false testimony; (2) concerning a material matter; (3) with the willful intent to deceive (rather than as a result of confusion, mistake, or faulty memory).'" *United States v. Quinn*, 359 F.3d 666, 681 (4th Cir. 2004) (citing *United States v. Jones*, 308 F.3d 425, 428 n.2 (4th Cir. 2002) (citing *United States v. Dunnigan*, 507 U.S. 87, 92-98, 113 S. Ct. 1111, 122 L. Ed. 2d 445 (1993))).

In fact, "an enhancement under § 3C1.1 does not apply automatically every time a criminal defendant who testifies at trial is convicted. It may be that the defendant's specific statements on the stand were true, or were not intentionally false, or were not material." *United States v. Smith*, 62 F.3d 641, 646-47 (4th Cir. 1995).

The *Dunnigan* Court noted that the "district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out." (*Id*. at 647).

The district court's findings below do not support the enhancement. The district court found only that it believed that Adkins lied (JA 576 at ¶ 25; 577 at ¶¶ 1-9). The trial court stated that Adkins committed perjury, but never explained how Adkins met the test described in *Dunnigan* (JA 576 at ¶ 25; 577 at ¶¶ 1-9). The sentencing court never found that Adkins' testimony concerned a material matter or that he willfully deceived (JA 576 at ¶¶ 18-24). The district court's enhancement mechanically followed the jury's verdict in contravention of *Dunnigan* and was therefore improper.

Third, the District Court erred by denying the safety valve to Mr. Adkins. Under 18 U.S.C. § 3553(f), in order to avoid the statutory minimum sentence, the defendant must meet the following requirements:

> (1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;
> (2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
> (3) the offense did not result in death or serious bodily injury to any person;
> (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the

41

sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act; and

(5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

18 U.S.C. § 3553(f)

Adkins met the first four requirements, but the Court assumed that because the jury found Mr. Adkins guilty he must have lied. The district court therefore found that he did not meet the fifth requirement. The court assumed because the jury found Adkins guilty, he must have been lying about his relationship with Mr. Wheeler. But,

> *Section 3553(f)* requires a determination by the judge, not the jury, as to the satisfaction of the five underlying criteria. This is no accident. The judge is privy to far more information than the jury and is therefore in a much different posture to assess the case and determine whether the defendant complies with *§ 3553(f)*.

*United States v. Sherpa*, 110 F.3d 656, 660 (9th Cir. 1996). In fact, "[c]onviction by a jury does not foreclose relief under the safety valve provision." *See United States v. Sherpa*, 110 F.3d 656, 660 (9th Cir. 1996) (finding that a defendant who claimed ignorance of the contents of a suitcase

satisfied § 3553(f)(5), even though the jury found that he knowingly possessed heroin)." *United States v. Gonzalez-Montoya*, 161 F.3d 643, 652 (10th Cir. 1998). The district court therefore should not have denied the safety valve simply because the jury returned a guilty verdict.

## <u>CONCLUSION</u>

Wherefore, Adkins requests that the Court reverse the judgment of the district court judgment and enter final judgment for the defendant or for a new trial.

## <u>REQUEST FOR ORAL ARGUMENT</u>

Adkins requests oral argument.

Respectfully Submitted,

BARRY ADKINS

By <u>/s/ Terry N. Grimes</u>
     Of Counsel

Terry N. Grimes
GRIMES & WILLIAMS, P.C.
320 Elm Avenue, SW
Roanoke, Virginia 24016
(540) 982-3711

*Counsel for Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P.
28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*9,714*] words, excluding the parts of the brief
exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[    ] this brief uses a monospaced typeface and contains [*state the number
of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P.
32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P.
32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using
[*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state
name and version of word processing program*] with [*state number of
characters per inch and name of type style*].

Dated: <u>August 6, 2012</u>          <u>/s/ Terry N. Grimes</u>
                                                        *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 6th day of August, 2012, I caused this Brief of

Appellant to be filed electronically with the Clerk of the Court using the CM/ECF

System, which will send notice of such filing to the following registered CM/ECF

users:

> Monica D. Coleman
> Office of the U.S. Attorney
> Post Office Box 1713
> 300 Virginia Street, East, Suite 4000
> Charleston, West Virginia  25326
> (304) 345-2200
>
> *Counsel for Appellee*

I further certify that on this 6th day of August, 2012, I caused the required

copies of the Brief of Appellant and Joint Appendix to be hand filed with the Clerk

of the Court and a copy of the Joint Appendix to be served, via UPS Ground

Transportation, upon counsel for the Appellee, at the above address.

/s/ Terry N. Grimes
*Counsel for Appellant*